## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT FRANKFORT

|  |  |  |
|---|---|---|
| Jordyn Cox, as Administratrix of the | ) | Civil Action No. |
| Estate of Karl Belcher, deceased; | ) | X:22-cv-XXXXX-YYY |
| Taylor McVay, as Successor Administratrix | ) |  |
| Of the Estate of Timothy Farrow, deceased; | ) |  |
| David Bleeker, as Administrator | ) |  |
| of the Estate of Della Bleeker, deceased | ) |  |
|  | ) |  |
|     Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| Reliant Rehabilitation Holdings, Inc.; | ) |  |
| Reliant Pro Rehab, LLC; Thomas D. Scott | ) |  |
|  | ) |  |
|     Defendants. | ) |  |

**************************************************************

COMES NOW the Plaintiffs, THE ESTATE OF KARL BELCHER, by and through JORDYN COX, Personal Representative; THE ESTATE OF TIMOTHY FARROW, by and through TAYLOR MCVAY, Personal Representative; THE ESTATE OF DELLA BLEEKER, by and through DAVID BLEEKER, Personal Representative (collectively, the "Plaintiffs"), and for their Complaint, on their own behalf, and on behalf of similarly-situated individuals, file this Class Action for Damages against Defendants, Reliant Rehabilitation Holdings, Inc.; Reliant Pro Rehab, LLC;

and Thomas D. Scott (referred to collectively as "Defendants"), and allege as follows:

## NATURE OF THE CLASS ACTION CLAIMS

1.      Upon information and belief, through fraud, breach of fiduciary duty, and conspiracy, the Defendants have defrauded Plaintiffs of property or chattels, and have otherwise caused the Plaintiffs and all similarly-situated class members, to unlawfully *incur debts, liens, claims and/or charges* compensable to Medicaid by Plaintiffs of over seventy-five thousand dollars ($75,000.00), and up to approximately eight hundred million dollars ($800,000,000.00) for the entire Class, for the provision of physical therapy by Reliant Rehabilitation Holdings and Reliant Pro Rehab at skilled nursing home facilities owned directly or indirectly by Thomas Scott in the Commonwealth of Kentucky, during the period July 1, 2012 to different points in time in 2018.

2.      As a result, Plaintiffs, individually and on behalf of the Class, seek to recover damages from the Defendants for violations of 18 U.S.C. §1961 et seq. (RICO), for fraud, for breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty, for civil conspiracy, and for other violations of federal and State law.

## THE PARTIES

## PLAINTIFFS

2

3.     Jordan Cox is the Administratrix of the Estate of Karl Belcher, deceased, as appointed by Order of Bath County District Court, Probate Division, Case No. 17-P-00065 and therefore brings this action on behalf of the Estate of Karl Belcher, deceased, pursuant to the Survival of Actions Statute (K.R.S. § 411.140).

4.     Jordyn Cox is a resident of the Commonwealth of Kentucky.

5.     In 2011, Karl Belcher was admitted as a resident of Stanton Nursing and Rehabilitation Center, f/k/a Stanton Nursing Center, a skilled nursing facility owned directly or indirectly by Thomas Scott, located at 31 Derickson Lane, Stanton, Powell County, Kentucky 40380, and except for times when he was hospitalized, remained a resident there until July of 2013.  Mr. Belcher died on January 16, 2017.

6.     Taylor McVay is the Successor Administratrix of the Estate of Timothy Farrow, deceased, as appointed by Order of Pulaski County District Court, Probate Division, Case No. 17-P-00091 and therefore brings this action on behalf of the Estate of Timothy Farrow, deceased, pursuant to the Survival of Actions Statute (K.R.S. § 411.140).

7.     Taylor McVay is a resident of the Commonwealth of Kentucky.

8.     Timothy Farrow was admitted as a resident of Elizabethtown Nursing and Rehabilitation Center, a skilled nursing facility owned directly or indirectly by Thomas Scott, located at 1101 Woodland Drive, Elizabethtown, KY

3

42701, on June 12, 2013, and except for hospitalizations, remained there until his death on November 5, 2016.

9.   David Bleeker is the Administrator of the Estate of Della Bleeker, deceased, as appointed by Order of Magoffin County District Court, Probate Division, Case No. 15-P-110 and therefore brings this action on behalf of the Estate of Della Bleeker, deceased, pursuant to the Survival of Actions Statute (K.R.S. § 411.140).

10.   David Bleeker is a resident of the Commonwealth of Kentucky.

11.   Upon information and belief, Della Bleeker became a resident of Salyersville Nursing and Rehabilitation Center, a skilled nursing facility owned directly or indirectly by Thomas Scott, located at 571 Parkway Drive, Salyersville, KY 41465, on August 1, 2015, and except for hospitalizations, remained there until August 19, 2015, the day she died.

### RELIANT DEFENDANTS

12.   At all times relevant hereto, upon information belief Defendant Reliant Rehabilitation Holdings, Inc. was and is a Delaware corporation with its principal place of business at 5800 Granite Parkway, Suite 1000, Plano, Texas 75024, with the power to sue and be sued.   Defendant Reliant Rehabilitation Holdings may be served at its registered agent, CT Corporation System 306 W. Main Street, Suite 512, Frankfort, KY 40601.

13.     At all times relevant hereto, upon information belief Defendant Reliant Pro Rehab, LLC was and is a Delaware limited liability company with its principal place of business at 5800 Granite Parkway, Suite 1000, Plano, Texas 75024, with the power to sue and be sued.   Defendant Reliant Pro Rehab may be served at its registered agent, CT Corporation System 306 W. Main Street, Suite 512, Frankfort, KY 40601.

14.     Defendants Reliant Rehabilitation Holdings, Inc. and Reliant Pro Rehab (aka "Reliant Defendants," or simply, "Reliant") had fiduciary duties to those skilled nursing facility residents to which they, the Reliant Defendants, were providing therapy.

15.     The causes of action made the basis of this suit arise out of such business conducted by said Defendants Reliant Rehabilitation Holdings, Inc. and Reliant Pro Rehab, LLC, in the provision of therapy at twenty-one skilled nursing facilities in the Commonwealth of Kentucky owned directly or indirectly by Thomas Scott from 2012 to 2018.

## DEFENDANT THOMAS SCOTT

16.     Upon information and belief, Defendant Thomas Scott was owner directly or indirectly of twenty-one skilled nursing facilities in the Commonwealth of Kentucky from July 1, 2012 to 2018 ("Preferred Care KY Regime")—skilled nursing facilities operating as limited partnerships, which filed for bankruptcy in

5

2017, produced no distributions, and have now been largely wound up. Defendant Thomas Scott was 99% limited partner of these facilities, and the sole member of the 1% general partner LLC (also bankrupt).

17.     Thomas Scott controlled and managed the Preferred Care KY Regime through management companies owned by separate individuals who were former employees of Defendant Thomas Scott, and had Defendant Thomas Scott's skilled nursing facilities in the Preferred Care KY Regime and otherwise, as said management companies' sole customers.  Said management companies and the Preferred Care KY Regime skilled nursing facilities shared legal counsel, one Robert Riek, Esq.  At all times material to this action, Defendant Thomas Scott managed, controlled and/or provided services for all twenty-one skilled nursing facilities.

18.     Said management companies are also bankrupt.

19.     In August 2017, Defendant Thomas Scott claimed that, in 2007, he owned over 30% of Defendants Reliant Rehabilitation Holdings, Inc. and/or Reliant Pro Rehab.  (**EXHIBIT A** Deposition of Thomas Scott in *The Estate of Lois Kelley v. Preferred Care of Delaware, Inc.*, pp. 104-106)

20.     In August 2017, Defendant Thomas Scott claimed that, as of that time, his ownership of Reliant Rehabilitation Holdings, and/or Reliant Pro Rehab remained at 4%.  (**EXHIBIT A** Deposition of Thomas Scott, pp. 104-106)

6

21.     Defendant Thomas Scott had fiduciary duties to those skilled nursing facility residents residing in his Preferred Care KY Regime facilities.

22.     The causes of action made the basis of this suit arise out of such business conducted by said Defendant Thomas Scott in the ownership, operation, management, control and/or services provided for and at these facilities, particularly as regards the provision of therapy at the twenty-one skilled nursing facilities in the Commonwealth of Kentucky owned by Thomas Scott from 2012 to 2018.  Defendant Thomas D. Scott may be served by the Secretary of State's Office at his business address of 5420 W. Plano Parkway, Plano, TX 75093.

## **JURISDICTION AND VENUE**

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § l332(a)(l) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.

24.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of The United States of America.

25.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

## COMMON FACTS

26.    Senior housing, and more specifically skilled nursing facilities, is a highly regulated industry at both the federal and State levels.

27.    Services contracted for, to include therapy services, at skilled nursing facilities ("SNFs") are likewise heavily regulated at both the federal and State levels.

28.    The bulk of the income for both SNFs and their contracted service providers comes from federal and State programs such as Medicare and Medicaid.

29.    The causes of action asserted in this class action complaint arise from the provision of therapy services at:

a. Kenwood Health and Rehabilitation Center, which is located at 130 Meadowlark Drive, Richmond, Kentucky 40475.

b. Madison Health and Rehabilitation Center, which is located at 131 Meadowlark Drive, Richmond, Kentucky 40475.

c. Christian Heights Nursing and Rehabilitation Center, which is located at 124 Nashville Street, Pembroke, Kentucky 42266.

d. Cumberland Nursing and Rehabilitation Center, which is located at 200 Norfleet Drive, Somerset, Kentucky.

e. Salyersville Nursing and Rehabilitation Center, which is located at 662 Parkway Drive, Salyersville, Kentucky.

f. Bowling Green Nursing and Rehabilitation Center, which is located at 1561 Newton Avenue, Bowling Green, Kentucky.

g. Shady Lawn Nursing and Rehabilitation Center, which is located at 2582 Cerulean Road, Cadiz, Kentucky 42211.

h. Woodcrest Nursing and Rehabilitation Center, which is located at 3876 Turkeyfoot Road, Elsmere, Kentucky 41018.

i. Twin Rivers Nursing and Rehabilitation Center, which is located at 2420 West Third Street, Owensboro, Kentucky 42301.

j. Elizabethtown Nursing and Rehabilitation Center, which is located at 1101 Woodland Drive, Elizabethtown, Kentucky 42701.

k. Hardinsburg Nursing and Rehabilitation Center, which is located at 101 Fairgrounds Road, Hardinsburg, Kentucky 40143.

l. Morganfield Nursing and Rehabilitation Center, which is located at 509 North Carrier Street, Morganfield, Kentucky 42437.

m. Campbellsville Nursing and Rehabilitation Center, which is located at 1980 Old Greensburg Road, Campbellsville, Kentucky 42718.

n. Franklin-Simpson Nursing and Rehabilitation Center, which is located at 414 Robey Street, Franklin, Kentucky 42135.

o. Springfield Nursing and Rehabilitation Center, which is located at 420 East Grundy Avenue, Springfield, Kentucky 40069.

p. McCracken Nursing and Rehabilitation Center, which is located at 867 McGuire Ave, Paducah, Kentucky 42001.

q. Irvine Nursing and Rehabilitation Center, which is located at 411 Bertha Wallace Drive, Irvine, Kentucky 40336.

r. Stanton Nursing and Rehabilitation Center, which is located at 31 Derickson Lane, Stanton, Kentucky 40380.

s. Brandenburg Nursing and Rehabilitation Center, which is located at 814 Old Ekron Road, Brandenburg, Kentucky 40108.

t. Fordsville Nursing and Rehabilitation Center, which is located at 313 Main Street, Fordsville, Kentucky 42343.

u. Henderson Nursing and Rehabilitation, which is located at 2500 North Elm Street, Henderson, Kentucky 42420.

30.    The Reliant Defendants contract with SNFs to provide rehabilitation therapy services to SNF residents.  Reliant Defendant employees or contractors provide various rehabilitation services at or on behalf of the facility, and the Reliant Defendants are compensated by the facility for those services. Many of those services are, in turn, billed to federal and State healthcare programs by the facility on behalf of SNF residents.

31.    Headquartered in Plano, Texas, the Reliant Defendants are a provider of contract rehabilitation management services. According to its website, Reliant

provides rehabilitation programs to over 870 "Skilled nursing facilities in forty states." *See http://www.reliant-rehab.com/about-us* (last visited on 8/01/22).  The Reliant Defendants typically are compensated for these services by their facility customers, which, in turn, are reimbursed for the same services from third-party payors, including federal and State healthcare programs.

32.     Residents of the above-stated SNFs that engaged with the Reliant Defendants for the provision of therapy services, were fraudulently billed for unnecessary and even contraindicated therapies, and were otherwise defrauded in the provision of therapy services.

33.     Such frauds included, but were not limited to, the provision of treatment protocols that did not follow the residents' individual plans of care; over-billing in terms of both therapy time and therapy type; complete absence of therapies nonetheless billed-for; Medicare and/or Medicaid criteria not being met for billing and therapy provision; and assessments not being done in accordance with physical therapy guidelines or in accordance with Medicare or Medicaid guidelines.

34.     ***Such fraudulent and/or improper billing practices caused damages in the form of debts and/or liens accrued by the residents and/or resident probate estates, and/or fraudulent bills paid by the residents.***

11

35.     Upon information and belief, the Estate of Karl Belcher had a probate estate claim made against it by Medicaid in the amount of $122,617.35, the majority of which being for therapy services, and much of which was unnecessary or contraindicated.

36.     Upon information and belief, the Estate of Timothy Farrow had a probate estate claim against it made by Medicaid in the amount of $163,305.13, the majority of which being for therapy services, and much of which was unnecessary or contraindicated.

37.     Upon information and belief, the Estate of Della Bleeker had a probate estate claim against it made by Medicaid in the amount of $9,902.75, part of which being for therapy services and much of which was unnecessary or contraindicated.

38.     Defendants acted in concert and/or in a joint venture to fraudulently bill Plaintiffs, and Medicare and/or Medicaid on behalf of facility residents.

39.     Defendants thereby committed healthcare fraud against the facility residents.

40.     In committing healthcare fraud, Defendants intentionally concealed from Medicare and/or Medicaid, and these facility residents, that Defendants were violating the fiduciary duties owed to the facility residents.

41.     Defendants are directly or vicariously liable for any acts and omissions by any person or entity, directly or indirectly controlled, including any

governing body, officer, employee, ostensible or apparent agent, partner, consultant or independent contractor, whether in-house or outside individuals, entities, agencies or pools.

## CONTEXT

42.     This case involves both Medicare and Medicaid, which are government-directed and funded programs that are intertwined one with the other.

43.     Medicare is a federally funded and administered health insurance program that provides benefits to certain groups.  It is of limited duration and funding.  The U.S. Department of Health and Human Services administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS").  The Medicare program is divided into four components: (1) **Part A**, the hospital insurance benefits program, 42 U.S.C. §§ 1395c, 1395d; (2) **Part B**, the supplemental medical insurance benefits program, which pays for a portion of certain medical and other services, 42 U.S.C. §§ 1395j, 1395k, 1395i; (3) **Part C**, the Medicare Advantage Program, which allows CMS to contract with public and private entities to provide Medicare Parts A and B benefits to certain beneficiaries, 42 U.S.C. § 1395w-21 *et seq.;* and (4) **Part D**, the voluntary prescription drug benefit program, 42 U.S.C. § 1395w-101 *et seq.*

44.     With Medicare, a patient is only eligible for a limited number of days at a skilled nursing home facility during that person's lifetime.  The time is generally 60 days for Medicare Part A.  Thereafter, Medicare Part B is accessed if necessary and applicable.

45.     If the patient is on Medicare Part B, a ***co-payment*** is required.  Further, a SNF may ***take most of the resident/patient's social security and/or other monthly income***, often leaving the resident/patient with only a nominal amount to buy small personal items throughout the month.  42 C.F.R. § 483.10(f)(10)(ii)(B).

46.     For SNF or therapy services to be reimbursable under Medicare or Medicaid at least the following conditions must be met: (1) the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient received care in a skilled nursing facility (for a condition treated during the hospital stay).  *See* 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

47.     To be considered "skilled," and thereby reimbursable, a service must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. §

409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R. § 409.3 l(a).

48.     For Part A beneficiaries, the SNF submits claims for therapy services as part of the Part A claims for the *per diem* assigned to that resident, which thereby provides fees to both the SNF and the therapy provider. As explained below, the Resource Utilization Group ("RUG") category for each Part A patient takes into account the facility's costs for services performed for Part A beneficiaries, including the rehabilitation therapy services performed "under arrangement." Pursuant to 42 C.F.R. § 413.17, all outside therapy services subsisting under common ownership or control with its SNFs under arrangement, must provide services at a comparable price to those services that could be purchased from therapy services not under common ownership or control.

49.     Medicare requires providers of skilled nursing facility rehabilitation therapy to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set ("MDS"). The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay a nursing facility to provide skilled nursing therapy to that patient.

50.    In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility.  The date the facility performs the assessment is known as the assessment reference date. A nursing facility may perform the assessment within a window of time before this date, or, under certain circumstance, up to five days after. When a nursing facility performs its assessment (except for the first assessment), it examines the patient for the seven days preceding the assessment reference date. As discussed above, this seven day assessment period is referred to as the "look-back period."

51.    The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section P of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the lookback period. In particular, Section P shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (*i.e.*, physical therapy, occupational therapy, and speech-language pathology and audiology services). As discussed below, the information contained in Section P directly impacts the rehabilitation RUG level to which a patient will be assigned.

52.     Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient, *see* 63 Fed. Reg. 26252, 26259-60 (May 12, 1998), and the daily rate that Medicare pays a nursing facility depends, in part, on the RUG to which a patient is assigned.

53.     Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

54.     There are generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy; Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

55.     The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period").

56.     Medicare pays the most for those beneficiaries that fall into the Ultra High RUG level. The Ultra High ("RU") RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26252, 26258 (May 12, 1998).

57.     For Part B beneficiaries, who are not eligible under Part A or who have exhausted their Part A benefit, the SNF submits claims for payment for the therapy services under the Medicare Fee Schedule ("MFS"). The MFS establishes a per-service payment for individual therapy services based on time-based codes appropriate to the service provided.

58.     Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26265. The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." Minimum Data Set (MDS)-Version 2.0 for Nursing Home Resident Assessment and Care Screening.

59.     A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included in the CMS-1450, which nursing facilities submit electronically to Medicare for payment. *See* Medicare Claims Processing Manual, Ch. 25, § 75.5. Medicare payment will depend largely on the HIPPS code the nursing facility

submitted as part of the CMS-1450. *See* 63 Fed. Reg. at 26267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

60.    The Medicaid program was created in 1965 as part of the Social Security Act, which authorized federal grants to States for medical assistance to low income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children.  Whereas Medicare serves as a type of healthcare insurance, with limited or no provision for repayment by the Medicare benefit recipient, Medicaid is more analogous to a loan to eligible individuals, who have exhausted their own financial resources, ***with an expectation of repayment if and when able***.

61.    The Medicaid program typically picks up ***where Medicare and the SNF resident's own resources (including Social Security entitlements) leave off*** and is jointly financed by the federal and State governments. CMS administers Medicaid at the federal level.  Within broad federal rules, each State decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The States directly pay providers, with the States obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994).

62.    SNFs may elect to contract with third party suppliers of rehabilitation therapy services under Medicare or Medicaid, such as Reliant Rehabilitation

Holdings and Reliant Pro Rehab, to provide care to their residents. Again, these contracts are referred to as "under arrangement" contracts.

63. When a SNF has entered into an "under arrangement" contract with a therapy services provider—such as Reliant Rehabilitation Holdings and Reliant Pro Rehab—the service provider submits invoices to the SNF for the services it provides to residents, and the SNF, in turn, submits the claim for those services to Medicare or Medicaid for the SNF resident. Both the SNF and the service provider are paid from these claims.

64. Medicaid-paid benefits constitute debts ultimately incurred by the nursing home residents, or their subsequent probate estates. *See e.g.*, 42 C.F.R. 411.23; 42 C.F.R. 411.37. That is, again, the Medicaid recipient is liable to reimburse Medicaid for these payments if and when the recipient becomes financially able.

65. Additionally, Kentucky's Cabinet for Health and Family Services, Department for Medicaid Services will seek recovery from the estate of a deceased Medicaid recipient. *See* 907 KY. ADMIN. REGS. 1:585.

66. Plaintiffs, as Medicaid recipients, have several responsibilities and may incur financial liability to Medicaid under Medicaid rules. First, in order to be eligible for Medicaid, the rules require that each recipient "***spend down***" his or her own assets to $2,000 or under in order for eligibility, and this "spending down" may be to pay for therapy services. Furthermore, there are ***liens and/or claims***

20

*which attach to a deceased Medicaid resident's estate* for any estate valued at more than $10,000.  907 KY. ADMIN. REG. 1:585 Sec. 2(4)(b)2.  Furthermore, a high percentage of skilled nursing home residents do not have a surviving spouse or minor child (which act as exceptions to the Medicaid claim).   Thus any unnecessary utilization of a patient's Medicare and/or Medicaid benefits through the provision of unnecessary therapy works an injury upon the resident.

67.     In effect, on their nursing home residents' behalf, Defendants borrowed money from Medicaid, as well as took the residents' money, to pay for therapy.

## SPECIFIC ALLEGATIONS

68.     On December 27, 2016, the United States of America, and the States of Connecticut, Florida, Iowa, Louisiana, Maryland, Nevada, New Mexico, Oklahoma, and Texas, through relator Susan Helton, filed a *Qui Tam* action under a "Jane Doe," in the United States District Court for the Eastern District of Kentucky against the following defendants:

   a. Stanton Health Facilities, L.P. and Preferred Care Inc.;

   b. Preferred Care Partners Management Group, L.P. and Kentucky Partners Management, LLC;

   c. Reliant Pro Rehab, LLC and Reliant Rehabilitation Holdings, Inc.;

   d. Thomas D. Scott.

(**EXHIBIT B** First Amended Complaint in *United States of America ex. rel. Jane Doe v. Preferred Care, Inc.* (E.D.Ky.))

69.     This action alleged, amongst other things, that Defendants Reliant Pro Rehab, LLC, Reliant Rehabilitation, Inc., and Thomas Scott conspired to defraud Medicare and Medicaid by misrepresenting the medical condition of, and therapy provided to, residents at Preferred Care KY Regime SNFs.

70.     On June 5, 2017, the United States of America, and the States of Arizona, Arkansas, Colorado, Florida, Iowa, Kansas, Kentucky, Missouri, Nevada, New Mexico, Oklahoma, and Texas, through relator Joseph Donchatz filed a *Qui Tam* action in the United States District Court for the Eastern District of Kentucky against the following defendants:

a. Stanton Health Facilities, L.P. and Preferred Care Inc.;

b. Preferred Care Partners Management Group, L.P. and Kentucky Partners Management, LLC;

c. Reliant Pro Rehab, LLC and Reliant Rehabilitation Holdings, Inc.;

d. Thomas D. Scott.

(**EXHIBIT C** Complaint in *United States of America ex. rel. Joseph Donchatz v. Stanton Health Facilities, L.P.* (E.D.Ky.))

71.     This action alleged, amongst other things, that Defendants Reliant Pro Rehab, LLC, Reliant Rehabilitation, Inc., and Thomas Scott conspired to defraud

22

Medicare and Medicaid by failing to meet Medicare and Medicaid criteria for the provision of therapy and by failing to follow SNF residents' individualized plans of care.

72.     Filed as *Qui Tam* actions, the Helton and Donchatz Complaints were initially filed under seal.

73.     On November 13, 2017, Preferred Care, Inc., all the above-stated Preferred Care KY Regime SNFs, Preferred Care Partners Management Group, L.P., and Kentucky Partners Management Group, LLC, filed for bankruptcy in the U.S. Bankruptcy Court for the Northern District of Texas.  As a result of these fillings, in November the United States moved to unseal the Helton and Donchatz *Qui Tam* actions, and Plaintiffs received notice of the contents of said Complaints, including the existence of the facts underlying the causes of action alleged below.

74.     Upon information and belief, Reliant held demonstrations of something called its "Medical Management" program to SNF operators.

75.     Upon information and belief, at one such demonstration, on February 10, 2014, which took place at Meadowview HCC, a SNF located in Harrisonville, Missouri, Reliant executives—including Reliant's Vice President of Business Development (Libby Pinnell), Vice President of Rehab services, and Director of Clinical Services—explained the program.  (**EXHIBIT D** Complaint in *United States of America ex. rel. Thomas Prose v. Reliant Rehabilitation* (ND.Tex), ¶¶ 49-52)

76.     Upon information and belief, at that February 10, 2014 demonstration, Reliant's executives explained that, under its Medical Management program, the company offers nurse practitioner services and physician's assistant services to SNFs that contract with Reliant to perform rehabilitation services. ***Said practitioners are employed by Reliant, and are provided on the condition that the facility use Reliant to perform rehabilitation services for the facility's residents***, Reliant would make the practitioners available to the facility either at no charge, or at a contracted rate that was well below fair market value for the services rendered. The executives characterized the offering as a "Value Added Service," claiming that it would ensure the ongoing success of the company's "healthcare partners."   The nurse practitioners and physician's assistants would staff the facility five days a week and remain on call to the facility's physicians 24/7.

77.     The cost of providing these nurse practitioner and physician's assistant services was significant to Reliant. One executive estimated that the company spent around $2 million annually in giving its services away, per SNF. As such, the Medical Management program was in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).   ***On the other hand***, as Reliant knew and intended, the Medical Management program was a remarkable profit generator, because of the rehabilitation services contracts it generated for the company.

24

Indeed, one Reliant executive estimated that the program led to at least an additional *$8 million* annually in rehabilitation services revenue per facility.

78.     Upon information and belief, the Preferred Care KY Regime engaged with Reliant in the latter's "Medical Management" program.   (**EXHIBIT E** discovered email *In re Preferred Care Management Group, L.P.* (Bankr.N.D.Tex.), Bates No. MCON 016973-016975)

79.     In SNFs, facility Administrators typically have authority to contract with vendors to provide resident and facility services.  However, with Preferred Care KY Regime SNFs engaging Reliant in Reliant's "Medical Management" program, Administrators were prohibited from contracting with any other vendor of physical therapy services, occupational therapy services, and speech therapy services other than Reliant companies.

80.     Preferred Care KY Regime relations with Reliant were controlled by Thomas Scott. (**EXHIBIT  F** Deposition of Roy Baber in *The Estate of Raleigh Olinger v. Preferred Care of Delaware, Inc.*, pp. 54-57; **EXHIBIT G** Reliant Promissory Note, footer p. 56; **EXHIBIT   H** Brief in Support of the Motion to Approve Scott Settlement Agreement, p. 18 *In re Preferred Care Inc.* (Bankr.N.D.Tex.))

81.     Upon information and belief, Reliant offered a discount to Preferred Care during calendar year 2015.  (**EXHIBIT I** discovered email *In re Preferred Care*

*Partners Management Group, L.P.* (Bankr.N.D.Tex.), Bates No. MCON 011995-011996)

82.     The skilled nursing home residents in question suffered adverse financial consequences vis-à-vis Medicare by prematurely exhausting their Medicare benefits, and by unnecessarily making co-payments.

83.     The skilled nursing home residents in question suffered adverse financial consequences vis-à-vis Medicaid as a result of expending their Medicare entitlements, spending their limited funds, and eventually incurring debts, claims, and/or liens.

84.     Due to Defendants' actions, Preferred Care KY Regime residents were duped into putting their health, care, and their finances, and literally their lives into the hands of dishonest facility owners and therapy companies.  They have a right to redress tangible financial injuries.  For every fraudulent bill sent out, Defendants were unjustly enriched and wrongfully reaped the fruits of a conspiracy to maximize their returns and profits.

85.     All the Defendants were vital components of a joint venture in a common enterprise, which at all material times was intended to defraud the Plaintiffs.

86.     In addition to placing their health and well-being in jeopardy, as a result of the schemes detailed herein all of the residents of the Preferred Care KY

Regime during the relevant time were injured by fraudulent billing.  (**EXHIBIT J**

U.S. Dept. of Justice Press Release regarding Settlement, *United States ex. rel. Prose*

*v. Reliant Rehabilitation*)

87.    Defendants, by virtue of the acts alleged, had actual knowledge of the

false billing, but nonetheless committed the aforementioned fraud for the specific

purpose of collecting ***millions of dollars*** from Medicare and/or Medicaid in total,

from large numbers of relatively small (or not so small) instances in over-billing,

with the intent or reckless disregard that such false billing would financially

damage Plaintiffs and the Class of persons similarly-situated.

## CLASS REPRESENTATIVE FACTS

88.    Karl Belcher was admitted to Stanton Nursing and Rehabilitation

Center, in Stanton Kentucky whereat Defendants performed physical therapy on

Mr. Belcher, and billing therefor, from July 1, 2012 through March 3, 2013, that was

unnecessary and contraindicated.  Mr. Belcher was a ***paraplegic*** upon entry into

the facility and was ***not a good candidate for the gait training rehabilitation*** to

which Defendants' physical therapy was directed.

89.    Karl Belcher suffered from financial harm at the hands of Defendants

as well.

90.    Timothy Farrow was admitted to Elizabethtown Nursing and

Rehabilitation Center, in Elizabethtown Kentucky whereat Defendants performed

physical therapy on Mr. Farrow, and billing therefor, from June 13, 2013 through March 13, 2015, that was unnecessary and *involuntary*.  Mr. Farrow refused therapy.  Mr. Farrow was admitted to the facility with congenital hydrocephalitis affecting his mental responses and one leg amputation, thereby requiring his care by others.  He was *not a good candidate for rehabilitation*.  The therapy goal of walking and returning home was unrealistic, with the ultimate result being unsatisfactory progress.   Mr. Farrow was subjected to *duplication* of therapy treatments.

91.    Timothy Farrow suffered from financial harm at the hands of Defendants.

92.    Della Bleeker was admitted to Salyersville Nursing and Rehabilitation Center, in Salyersville Kentucky whereat Defendants performed physical therapy on Ms. Bleeker, and billing therefor, from August 2, 2015 through August 18, 2015, that was unnecessary and painful.  Ms. Bleeker was admitted to the facility having been paralyzed for the previous four years and suffered from contractures.  She was *not a good candidate for rehabilitation* and in fact therapy could and did cause her unnecessary pain.

93.    Aside from the personal injuries, Della Bleeker suffered from financial harm at the hands of Defendants as well.

### CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of a class of persons (hereinafter, the "Class") who resided in any of the Preferred Care KY Regime SNFs and received therapy from Reliant Rehabilitation Holdings, and/or Reliant Pro Rehab at any time during the period July 1, 2012 to various times in 2018.

99.     On November 13, 2017, entities of the Preferred Care KY Regime owned by Defendant Thomas Scott filed for bankruptcy, whereupon the U.S. Department of Justice took action to unseal *Qui Tam* actions, thereby revealing Defendants' scheme and collusion to defraud SNF residents, Medicare, and/or Medicaid.

100.    Plaintiffs were put on notice after November 13, 2017 of the existence of the deliberate policy of fraud in which their Defendant-Fiduciaries were engaged.

101.    The Class is so numerous that separate joinder of each member is impracticable and contrary to the public good. Plaintiffs are unsure of the number of persons in the Class, but believe that the number will be in the tens of thousands. The members of the Class and/or their guardians and representatives are geographically dispersed throughout the Commonwealth of Kentucky.

102.    There are questions of law and fact which are common to the Class and which predominate over questions affecting the individual members.  In fact,

virtually all questions of fact are common to the representative parties and to the Class.   Likewise, the questions of law are virtually identical for the representative parties and each member of the Class.   Common questions of law and fact thus predominate over any question of law or fact affecting only individual members of the Class.

103.   There are numerous questions of law that are common to each claim, including:

a.   At what point did claims for Defendants' fraud and other malfeasance accrue;

b.   Whether there existed a fiduciary relationship between the Defendants and the Class members;

c.   What was the legal effect on the duties of the Defendants to the Class members, of said fiduciary relationship;

d.   What liability does Defendant Thomas Scott have for conspiring with Reliant to defraud the Class members;

e.   What liability do the Reliant Defendants have for conspiring with Thomas Scott to defraud the Class members;

f.   What is the liability of all Defendants for agreeing to participate in the schemes described herein;

30

g.      What are the elements for all the Common Law causes of action pleaded herein;

h.      What are the measure of damages for all the Common Law causes of action pleaded herein;

i.      What are the elements for a cause of action for violations of 18 U.S.C. §1962 under the schemes described herein?

j.      What are the measure of damages for a cause of action for violations of 18 U.S.C. §1962 under the schemes described herein?

104.    There are also numerous questions of fact that are common to each claim that will generate common answers, *see In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 722 F.3d 838, 852 (6th Cir. 2013), including:

a.      Whether Defendants for reimbursement purposes engaged in, and conspired to engage in, a common practice of automatically defaulting to skilled therapy as necessary and/or beneficial for Class members;

b.      Whether Defendants engaged in, and conspired to engage in, a common practice of up-coding Class members' RUG scores for the purpose of higher reimbursement;

c.      Whether Defendants engaged in, and conspired to engage in, a common practice of "rounding up" therapy time for the purpose of higher reimbursement;

d.      Whether Defendants breached their respective fiduciary duties to the Class members in procuring and/or providing therapies;

e.      Whether Defendants breached their fiduciary duties to the Class members in billing Medicare/Medicaid for said therapies;

f.      Whether Defendants otherwise provided therapy care and services to the Class members, and for which Medicare and/or Medicaid were/was otherwise incorrectly billed?

105.   The claims of the Plaintiffs are typical of the claims possessed and capable of being asserted by each member of the Class.

106.   Plaintiffs and each Class member, placed their trust, confidence, health, and safety (indeed their very lives) into the hands of the Preferred Care KY Regime SNFs controlled by Thomas Scott, creating a fiduciary relationship between the Class and Thomas Scott.

107.   Plaintiffs and each Class member, placed their trust, confidence, health, and safety (indeed their very lives) into the hands of Defendants Reliant Rehabilitation Holdings, Inc. and Reliant Pro Rehab, LLC, creating a fiduciary relationship.

108.   Specifically, Plaintiffs and each member of the Class, or their guardian or personal representative, entered into a contract with the Preferred Care KY Regime SNFs which required payment by, or on behalf of, the Plaintiffs and Class

32

members for the care, services, and supplies provided by the Preferred Care KY Regime SNFs, to include therapy; and Plaintiffs and each Class member have paid, or have had payments made by Medicaid and/or Medicare on their behalf, to the SNFs for services, care and supplies provided by the Preferred Care KY Regime SNFs, to include therapy.

109.    Plaintiffs understand the nature of a class action and agree to be bound by the method chosen by the Court or jury to allocate damages for the claims in the Complaint and agree to be bound by the verdict of a jury on all issues triable by jury.

110.    Plaintiffs are committed to prosecuting this action and have retained the undersigned attorneys who are experienced in complex litigation and have particular experience and expertise in nursing home litigation.  As a result of prior litigation, the attorneys have gathered significant information and evidence about nursing homes owned and managed by the common enterprise detailed herein. The offices of Wilkes and Associates, P. A. are structured and staffed to resolve complex legal issues, evaluate the care and services provided at the Preferred Care KY Regime SNFs, and to investigate the actions of Defendants in a thorough and efficient manner.

111.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy.  It would be impracticable and

inefficient to adjudicate these actions independently.  Separate adjudication of the same facts and law in separate courts with thousands of separate juries would create a waste of resources and economy for the courts, the Defendants, the Plaintiffs, the juries, and the public.  Given the widely-varying amounts of false billing foreseeably involved, many of the residents at the Preferred Care KY Regime SNFs listed herein lack the ability and the resources to pursue individual actions against the Defendants.  Separate adjudication also would create the risk of inconsistent judgments.  Thus, class representation is superior to other available methods for the fair and efficient adjudication of the controversy.

112.   The prosecution of separate claims by the individual class members would also create the risk of adjudications concerning the individual members thereof, which as a practical matter, would be dispositive of the interests of other members of the Class who are not parties to the adjudications, or substantially impair or impede the ability of those other members thereof who are not parties to the adjudications to protect their interests.

113.   It would be impracticable and undesirable for the members of the Class to bring separate actions, as adjudication of thousands of different plaintiffs would create a risk that different juries would come to very different conclusions regarding the conduct of the Defendants.  Thus, the prosecution of separate claims by individual members of the Class would create risk of inconsistent or varying

adjudications concerning individual members of the Class which could establish incompatible standards of conduct for the Defendants.

114.   The members of the Class can be easily identified and located from the records of the Defendants listed herein, or from related third parties. Thus, notice to all members of the Class may be easily and efficiently accomplished at the time and manner established by the Court.

115.   Plaintiffs have engaged the professional services of the undersigned attorneys to initiate and prosecute this action. Pursuant to authoritative case law, the litigation expenses of such Plaintiffs' counsel and Class counsel's attorneys' should be paid from the common fund generated in this cause, if any, from amounts awarded pursuant to state Common Law and federal statutory law, with such fees being subject to Court approval. The payment of such fees and reimbursement of litigation expenses is, therefore, contingent on the outcome of the litigation.

**Count I**
**RICO**

116.   The Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

117.   At all relevant times, each Plaintiff is a person within the meaning of 18 U.S.C. § 1961 (3).

118.    At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962 (a-d).

119.    At all relevant times, each of the Defendants participated in the conspiracy to defraud Plaintiffs and Class members.

120.    At all relevant times, each of the Defendants conspired with the other Defendants to violate the provisions of 18 U.S.C. § 1962(a-d).

121.    Each Defendant and his or its co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint, namely to submit unlawful billing to residents, Medicare and/or Medicaid, thereby defrauding Plaintiffs and Class members.

122.    Defendants constitute an association-in-fact enterprise, within the meaning of 18 U.S.C. §§ 1961 (4) and 1962 (a-d), referred to in this Count as the "Enterprise."

123.    As alleged with particularity above, Defendants received income derived, directly or indirectly, from a pattern of racketeering activity that was used to acquire an interest in said Enterprise in violation of 18 U.S.C. § 1962(a).

124.    As alleged with particularity above, Defendants, through a pattern of racketeering activity, acquired and/or maintained, directly or indirectly, an interest in and/or control of said Enterprise in violation of 18 U.S.C. § 1962 (b).

125.   As alleged with particularity above, Defendants, as persons within the meaning of 18 U.S.C § 1961 (3), and as persons employed by and/or associated with said Enterprise, worked together and in concert to create and carry on the Enterprise engaged in a pattern of racketeering activities in violation of 18 U.S.C. § 1962 (c).

126.   As alleged with particularity above, Defendants conducted and participated, directly and indirectly, in the conduct, management, and/or operation of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 (5) and in violation of 18 U.S.C. § 1962 (a-d).

127.   The predicate acts which constitute this pattern of racketeering activity include numerous instances of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and fraud connected with a case under title 11, all of which constitute predicate acts within the meaning of 18 U.S.C. § 1962 and as defined by 18 U.S.C. § 1961.

128.   In furtherance of the Enterprise's affairs, Defendants used the mail, telephone, wire services, and internet in order to communicate with the other persons known and unknown participating in scheme to defraud nursing home residents, including the Plaintiffs and Class members here, by pattern overbilling.

129.    As alleged with particularity in the Complaint, each of the Defendants devised or intended to devise a scheme or artifice to defraud the Plaintiffs and Class members, and in doing so, used the mail, telephone, wire services, and internet to implement and complete the scheme to defraud and conceal the Enterprise and pattern of racketeering activity from the Plaintiffs in violation of 18 U.S.C. § 1341.

130.    As alleged with particularity in the Complaint, each of the Defendants devised or intended to devise a scheme or artifice to defraud the Plaintiffs and in doing so used the interstate telephone and telefax lines, cellular phones and internet transactions to implement and complete the scheme to defraud and conceal the Enterprise and pattern of racketeering activity from the Plaintiffs in violation of 18 U.S.C. § 1343.

131.    These acts, explained in detail in the Complaint, are acts of racketeering, occurring within ten years of one another, and constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 (5).

132.    The actions of Defendants were not isolated incidents, but were part of a continuous and on-going pattern of racketeering activity consisting of more than two, and, in fact, numerous predicate acts occurring on regular basis within ten years of one another.

133.    As a result of the concealment and misrepresentations of the nature of therapies provided coupled with the fiduciary duties owed to Plaintiffs and Class members, the Plaintiffs and Class members did not, and could not, discover the Defendants' fraudulent actions and participation in the Enterprise as described above at least until the filing of bankruptcy of entities within the Preferred Care KY Regime in November 2017.

134.    ***The Plaintiffs have been injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962, in that, as a direct and proximate result of the Defendants' actions, the Plaintiffs and Class members have acquired liens and/or debts, chargeable to them or their probate estates by Medicaid and were otherwise defrauded of property and chattels.***

135.    Further, Plaintiffs' injuries were a direct, proximate, and reasonably foreseeable result of the Defendants' violation of 18 U.S.C. § 1962.  As residents of entities in the Preferred Care KY Regime of SNFs, recipients of therapy therein provided by Reliant, the Plaintiffs were the ultimate victims of the unlawful Enterprise.

136.    Pursuant to 18 U.S.C. § 1964 (c), the Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants jointly and severally.

**Count II**
**Fraud**

137.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

138.    The elements of Common Law fraud in Kentucky are a) material representation, b) which is false, c) known to be false or recklessly made, d) made as an inducement to be acted upon, e) acted in reliance thereon, and f) causing injury.  *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).

139.    Defendants were obligated and under legal duty to generate accurate information to Medicare and Medicaid in their provision of therapy services, and in billings to Medicare and Medicaid.

140.    Defendants were fiduciaries and agents for Plaintiffs and Class members, regarding provision of therapy services, and all billings to Medicare and Medicaid.

141.    Plaintiffs and Class members relied to their detriment upon the representations of Defendants express or implied, that they would conform to their fiduciary duties, regarding the rendering of therapy services, and in all billings submitted to Medicare and Medicaid.

142.    Defendants intentionally misrepresented in billing, by act or omission, therapies provided to Plaintiffs and Class members by Defendant Reliant Rehabilitation Holdings, and Defendant Reliant Pro Rehab, while residents at SNFs owned, managed, or controlled by Defendant Thomas Scott; and thereby

caused Plaintiffs and Class members to prematurely exhaust their Medicare benefits, pay unnecessary co-payments, and be liable for debts to Medicaid.

143.   Defendants acted to defraud Plaintiffs and Class members, to the known detriment of Plaintiffs and Class members.

144.   The Defendants defrauded the residents of the SNFs by *inter alia*:

a.   Providing contraindicated therapy, and billing the residents and Medicare and/or Medicaid therefor;

b.   Providing unnecessary therapy, and billing the residents and Medicare and/or Medicaid therefor; and

c.   Miscoding therapy provided, and thus falsely billing the residents and Medicare and/or Medicaid;

d.   Otherwise falsely billing the residents and Medicare and/or Medicaid for therapy provided;

wherein said billing would inure to the detriment of the residents in the form of liens and/or debts to Medicaid and otherwise defraud the residents of their property and chattels.

145.   Defendant Thomas Scott received benefit from this fraud, was unjustly enriched through additional profits, including from Medicare and/or Medicaid, and/or by benefits provided to his SNFs by Defendants Reliant Rehabilitation Holdings and Reliant Pro Rehab free of charge or at reduced rates.

146.    Defendants Reliant Rehabilitation Holdings and Reliant Pro Rehab was unjustly enriched and received additional profits from this fraud, and/or through the benefits of contracting with Thomas Scott's SNFs.

147.    As a result of the concealment and misrepresentations of the nature of therapies provided coupled with the fiduciary duties owed to Plaintiffs and Class members, the Plaintiffs and Class members did not, and could not, discover the Defendants' fraudulent actions as described above at least until the filing of bankruptcy of entities within the Preferred Care KY Regime in November 2017.

148.    Said fraudulent acts further constituted material misrepresentations by act or omission vis-à-vis Plaintiffs and Class members, and such material misrepresentations were false, known to be false, or otherwise recklessly made.

149.    Said fraudulent acts are essential to the causes of action pleaded in this Complaint.

### Count III
### Aiding and Abetting Fraud

150.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

151.    "Aiding and abetting […] fraud, is a recognized claim in Kentucky." *Sierra Enterprises Inc. v. SWO & ISM, LLC*, 264 F.Supp.3d 826, 840  (W.D.Ky. 2017) (citations omitted).

152.    Defendants substantially assisted and encouraged each other in defrauding Plaintiffs and Class members by preparing numerous materially false billings, including to Medicare and/or Medicaid.

153.    As a result of the concealment and misrepresentations of the nature of therapies provided coupled with the fiduciary duties owed to Plaintiffs and Class members, the Plaintiffs and Class members did not, and could not, discover the Defendants' fraudulent actions as described above at least until the filing of bankruptcy of entities within the Preferred Care KY Regime in November 2017.

**Count IV**
**Breach of Fiduciary Duties**

154.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

155.    The elements of a cause of action for a breach of fiduciary duty in Kentucky are (1) the existence of a fiduciary duty; (2) the breach of that duty; (3) injury; and (4) causation.  *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 193 (Ky. 2019).

156.    At all relevant times, Defendants owed express and/or implied fiduciary duties to all of the residents at the SNFs including Plaintiffs, pursuant to Kentucky law.

157.    The Defendants breached their fiduciary duties to all the residents of the SNFs by *inter alia*:

a.      Providing contraindicated therapy, and billing the residents and Medicare and/or Medicaid therefor;

b.      Providing unnecessary therapy, and billing the residents and Medicare and/or Medicaid therefor; and

c.      Miscoding therapy provided, and thus falsely billing the residents and  Medicare and/or Medicaid therefor;

d.      Otherwise falsely billing the residents and  Medicare and/or Medicaid for therapy provided.

158.    Defendants had knowledge, based upon their extensive experience in the senior housing industry and the common enterprise, of their fiduciary duties and relationship with Plaintiffs and Class members by virtue of their status as residents in the Preferred Care KY Regime SNFs.

159.    As a result of the concealment and misrepresentations of the nature of therapies provided, coupled with the fiduciary duties owed to Plaintiffs and Class members, the Plaintiffs and Class members did not, and could not, discover the Defendants' fraudulent actions as described above at least until the filing of bankruptcy of entities within the Preferred Care KY Regime in November 2017.

160.    Defendants knew or should have known that their actions were in breach of their fiduciary duties and would cause harm to the Plaintiffs.

44

161.   As a direct and proximate result of the acts of Defendants, Plaintiffs suffered financial damages.

### Count V
### Aiding and Abetting Breach of Fiduciary Duties

162.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

163.   Aiding and abetting breach of fiduciary duty is recognized as a cause of action in Kentucky. *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 201 (Ky. 2019).

164.   Defendants substantially assisted and encouraged each other in breaching their fiduciary duties to Plaintiffs and Class members by preparing numerous materially false billings, including to Medicare and/or Medicaid.

165.   As a result of the concealment and misrepresentations of the nature of therapies provided, coupled with the fiduciary duties owed to Plaintiffs and Class members, the Plaintiffs and Class members did not, and could not, discover the Defendants' fraudulent actions as described above at least until the filing of bankruptcy of entities within the Preferred Care KY Regime in November 2017.

### Count VI
### Civil Conspiracy

166.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

167.    In Kentucky, in order to prevail on a claim of civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act. *Peoples Bank of Northern Kentucky, Inc. v. Crowe Chizek and Co. LLC*, 277 S.W.3d 255, 260-261 (Ky.Ct.App. 2008).

168.    Defendants each conspired and committed overt acts in furtherance of the conspiracy intentionally, knowingly, and/or recklessly with a conscious disregard and indifference to the high probability that injury would directly and proximately occur to the financial well-being and/or rights of the Plaintiffs.

169.    At all relevant times, the Defendants knew or should have known that their actions described would directly and proximately injure the Plaintiffs in the various ways described in the Complaint herein.

170.    As a result of the concealment and misrepresentations of the nature of therapies provided, coupled with the fiduciary duties owed to Plaintiffs and Class members, the Plaintiffs and Class members did not, and could not, discover the Defendants' fraudulent actions as described above at least until the filing of bankruptcy of entities within the Preferred Care KY Regime in November 2017.

171.    As the direct, foreseeable and proximate result of the acts of the Defendants described herein, the Plaintiffs sustained injuries including, but not limited to, receiving contraindicated therapy, receiving unnecessary therapy,

paying, or having payment made on their behalf, for the daily provision of nursing therapies procured through fraud.

172.    Defendants are jointly and severally liable for all the acts committed by their co-conspirators in furtherance of the conspiracy.

### Jury Demand

Plaintiffs and the Class members demand a trial by jury of all matters so triable, including compensatory and punitive damages.

WHEREFORE, Plaintiffs demand in law and equity, judgment against the Defendants for treble damages, punitive damages, restitution, unjust enrichment, disgorgement of profits, costs, expenses, reasonable attorneys' fees, and all other amounts to which Plaintiffs may be entitled.

Dated:        August 19, 2022

*/s/Robert E. Salyer*
HON. James L. Wilkes, II (Bar No. 94184)
HON. Robert E. Salyer (Bar No. 91859)
HON. Erica M. Roland (Bar No. 92219)
WILKES & ASSOCIATES, P.A.
421 N. Broadway, Ste. 203
Lexington, KY 40588-1747
Telephone: 859-455-3356
Facsimile: 813-286-8820

Primary: jimw@yourcasematters.com
rsalyer@yourcasematters.com
eroland@yourcasematters.com
dthomason@yourcasematters.com

KYStaff@yourcasematters.com
KY@yourcasematters.com
*Attorneys for Plaintiffs*